Jasen, J.
On this appeal, by the People, the question posed concerns the sufficiency of the evidence before a Grand Jury to support an indictment against the defendant for criminally negligent homicide in violation of section 125.10 of the Penal Law. The charge arose from an automobile accident which resulted in the death of Angela Palazzo, a pedestrian.
*330 The minutes of the Grand Jury contain the following pertinent testimony. The associate medical examiner read from the medical report of the autopsy which revealed the cause of Mrs. Palazzo’s death. According to the medical report, it was due to multiple external contusions, fracture of the vertebra and lower extension bleeding in both chest cavities — conditions which, in the opinion of the medical examiner, were brought about by a “ very considerable amount of force ’ ’. An eyewitness to the accident testified that at approximately 6:30 a.m. on April 28, 1968, she observed the deceased step off a city bus that had stopped at the corner of Castleton and Bard Avenues in Staten Island. After the bus had continued on and the signal light turned green in her favor, the deceased started to cross Castleton Avenue at the intersection. While in the middle of the street, she was struck by an oncoming automobile driven by the defendant, Booker W. Haney. The witness added that the car was ‘ ‘ some distance away ’ ’ from the intersection and ‘ ‘ coming fast ’ ’ when she first saw it, and that prior to the moment of impact, she did not hear a horn or the screeching of brakes. Patrolman Thomas Boche of the automobile investigation squad, who conducted the investigation of the accident, stated that the automobile which struck the deceased eventually crashed into a utility pole, causing considerable damage to it. In addition, he said that Mrs. Palazzo’s body was located 186 feet west of Bard Avenue, approximately 100 feet in front of the point where the defendant’s automobile had finally stopped. His investigation further determined that, based on the lengthy skid marks from the defendant’s car, the defendant’s car was traveling at least 52 miles per hour at the time it struck the utility pole. Detective John Plohetski testified that after he placed the defendant under arrest, and informed him of his rights, the defendant kept repeating, “ I didn’t mean to hit her, I didn’t mean to hit her.”[1]
*331 The indictment returned against the defendant charged him with criminally negligent homicide ‘ ‘ in that, among other things, he drove a vehicle at a high, reckless, dangerous and unlawful rate of speed; in that he failed and neglected to stop said vehicle at the intersection * * * although the traffic signal situated at said intersection was red * * * and did thereby cause the death of the said Angela Palazzo ”.
The defendant, after pleading not guilty, made a motion for inspection of the Grand Jury minutes. Supreme Court, Criminal Term, granted the motion and dismissed the indictment, holding that “ [t]he evidence before the Grand Jury, even though unexplained and uncontradicted, Would not * * * justify conviction by a trial jury ’’. (59 Misc 2d 162,167.) The Appellate Division unanimously affirmed on the opinion at Criminal Term.
Section 125.10 of the Penal Law provides that a person is guilty of the crime of criminally negligent homicide when, with criminal negligence, he causes the death of another person. Subdivision 4 of section 15.05 of the Penal Law defines ‘ ‘ Criminal negligence ” as follows: “ A person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that' a reasonable person would observe in the situation.”
It is the People’s claim that the indictment was erroneously dismissed since the facts presented to the Grand Jury “fall within ’ ’ section 125.10. Specifically, it is argued that the statutory test for the support of an indictment was met since the testimony before the Grand Jury would warrant a conviction by a trial jury for criminally negligent homicide. The defendant, on the other hand, urges that the dismissal of the indictment was proper, since the evidence before the Grand Jury established nothing more than ordinary civil negligence on his part, which conduct falls far short of that required to establish the crime of criminally negligent homicide.
A persistent problem, faced by the courts and legislatures alike, has been the formulation of the [1] ‘ extra ’ ’ qualities that *332 distinguish unintended homicides, which give rise to criminal liability, from those which, at most, produce civil liability for negligence. (See, e.g., Perkins, Criminal Law [1957 ed.], pp. 663-671; Paulsen and Kadish, Criminal Law and Its Processes [1962 ed'.], pp. 587-592; Byrn, Homicide Under the Proposed New York Penal Law, 33 Fordham L. Rev. 173, 205-206; Remington and Helstad, The Mental Element in Crime—A Legislative Problem, 1952 Wis. L. Rev. 644, 658-664; Hautamaki, The Element of Mens Rea in Recklessness and “ Criminal Negligence ”, 2 Duke B. J. 55.)[2] The Model Penal Code (Tent. Draft No. 4 [April 25, 1955], Comments to § 2.02, at p. 128) observes, concerning the judicial and statutory definitions of conduct causing death which is criminal, although unintentional: ‘ ‘ Thus under statutes, as at common law, the concept of criminal negligence has been left to judicial definition and the definitions vary greatly in their terms. As Jerome Hall has put it, the ‘judicial essays run in terms of “wanton and wilful negligence,” “ gross negligence,” and more illuminating yet, “ that degree of negligence that is more than the negligence required to impose tort liability. ’ ’ The apex of ambiguity is ‘ ‘ wilful, wanton negligence ” which suggests a triple contradiction— “ negligence ” implying inadvertence; “ wilful,” intention; and “wanton,” recklessness.’ [Citation omitted.] Much of this confusion is dispelled, in our view, by a clear-cut distinction between recklessness and negligence, in terms of the actor’s awareness of the risk involved.”
Cognizant of this problem, and in an endeavor to “ crystallize [this] area of culpability and liability ”, the Legislature incorporated in the revised Penal Law the dichotomy proposed by the Model Penal Code. (Commission Staff Notes on the Proposed New York Penal Law, Gilbert Criminal Code and Penal Law [1971], pp. 2-247-2-248.)[3] Thus, the revised Penal Law *333 makes unintended homicide manslaughter in the second degree, when it is committed “ recklessly ” (Penal Law, § 125.15)[4] and when committed “ negligently ”, though not recklessly, it is criminally negligent homicide. (Penal Law, § 125.10.)
The distinction between these two crimes is provided in section 15.05 (subds. 3[5], 4) of the Penal Law, which specifically describes the mental state requisite for each. The- reckless offender is aware of the proscribed risk and “ consciously disregards ” it, while the criminally negligent offender is not aware of the risk created and, hence, cannot be guilty of' consciously disregarding it. (Commission Staff Notes, Gilbert Criminal Code and Penal Law [1971], supra, at p. 2-248; see, also, discussion in Gegan, Criminal Homicide in the Revised New York Penal Law, 12 N.Y.L.P. 565, 578-579; Schwartz, Penal Law, Twelfth Annual Report of N. Y. Judicial Conference [1967], p. 109.) Since the criminally negligent offender’s liability arises only from a culpable failure to perceive the risk, his culpability is obviously less than that of the reckless offender who consciously disregards the risk. (See Model Penal Code, Tent. Draft No. 9 [May 8, 1959], § 201.4, at p. 53.)[6] It is, however, ‘ ‘ appreciably greater than that required for ordinary civil negligence by virtue of the ‘ substantial and unjustifiable ’ character of the risk involved and the factor of 1 gross deviation ’ from the ordinary standard of care.” (Commission Staff Notes, Gilbert Criminal Code and Penal Law [1971], supra, p. 2-248; *334 cf. Prosser, Law of Torts [4th eel.], § 31; Restatement, Torts, § 282.) [7]
Enactment of section 125.10 represents a marked change from prior law as the former Penal Law contained no crime truly equivalent to it. (Practice Commentary by Denzer and McQuillan, McKinney’s Cons. Laws of N. Y., Book 39, Penal Law, § 125.10, at pp. 224-225.) The present law lacks the moral implication of murder (Penal Law, § 125.25) or manslaughter in the first or second degree (Penal Law, §§ 125.15, 125.20), each of which involves awareness of the harm which will (or in some degree probably will) result from the offender’s conduct; Criminally negligent homicide, in essence, involves the failure to perceive the risk in a situation where the offender has a legal duty of awareness. It, thus, serves to provide an offense applicable to conduct which is obviously socially undesirable.[8] ‘ ‘ [It proscribes] conduct which is inadvertent as to risk only because the actor is insensitive to the interests and claims of other persons in society.” (Model Penal Code, Tent. Draft No. 9, supra, at p. 53.), The Legislature, in recognizing such conduct as criminal, endeavored to stimulate people towards awareness of the potential consequences of their conduct and influence them to avoid creating undesirable risks. (See Wechsler and Michael, AxRationale of the Law of Homicide, 37 Col. L. Rev. 701, 749- *335 751; 64 Col. L. Rev. 1469, 1538; Model Penal Code, Tent. Draft No. 4, supra, at pp. .126-127.)[9]
What amounts to a violation of this section depends, of course, entirely oil the circumstances of the particular conduct. Whether in those circumstances the act or acts causing death involved a substantial and unjustifiable risk, and whether the failure to perceive it was such as to constitute a gross deviation from the standard of care which a reasonable man would have observed under the same circumstances, are questions that generally must be left directly to the trier of the facts. In other words, “ [t]he tribunal must evaluate the actor’s failure of perception and determine whether, under all the circumstances, it was serious enough to be condemned.” (Model Penal Code, Tent. Draft No. 4, supra, at p. 126; see, also, Moreland, A Re-Examination of the Law of Homicide in 1971: The Model Penal Code, 59 Ky. L. J. 788, 828.)
WThile it is difficult to clarify further these questions (cf. People v. Eckert, 2 N Y 2d 126,130; People v. Angelo, 246 N. Y. 451, 457), it would seem sufficiently clear that for proper determination of these questions, two main considerations should be emphasized. Firstly, criminal liability cannot be predicated upon every careless act merely because its carelessness results in another’s death; and, secondly, the elements of the crime “ preclude the proper condemnation of inadvertent risk creation unless * the significance of the circumstances of fact would be apparent to one who shares the community’s general sense of right and wrong ’.” (Model Penal Code, Tent. Draft No. 9, supra, at p. 53, citing Hart, The Aims of the Criminal Law, 23 Law & Contemp. Prob. 401, 417.)
Turning to the case before us, upon consideration of the totality of the circumstances surrounding the defendant’s conduct, We conclude that the People put forward before the Grand Jury sufficient evidence to “ warrant a conviction by the trial jury.” (Code Crim. Pro., § 251; People v. Howell, 3 N Y 2d 672; People v. Donahue, 309 N. Y. 6; People v. Nitsberg, 289 N. Y. 523, 526; People v. Sweeney, 213 N. Y. 37, 42; People v. Glen, 173 N. Y. 395, 400.) In other words, the evidence presented to the Grand *336 Jury was the equivalent of prima facie proof that the crime charged had been committed by the defendant. (See, e.g., People v. D’Angelo, 29 N Y 2d 599; People v. Peetz, 7 N Y 2d 147; People v. Wess, 32 A D 2d 972, affd. 27 N Y 2d 933.)[10]
The evidence discloses that Mrs. Palazzo was struck by the defendant’s car while crossing Castleton Avenue at the intersection of Castleton and Bard Avenues with the traffic signal green in her favor. At the time she was struck, Mrs. Palazzo was half-way across Castleton Avenue. The evidence also indicates that the defendant failed to obey the red traffic signal at the intersection of Castleton and Bard Avenues and stop his motor vehicle, as required by law, before proceeding through the intersection. Additionally, there is evidence that he was traveling at a high rate of speed (approximately 52 mph) just before and at impact. Furthermore, no visual obstruction to the sighting of Mrs. Palazzo, lawfully crossing at the intersection, was apparent. It should be abundantly clear that such conduct cannot be characterized as mere carelessness, sufficient only to establish liability for ordinary civil negligence. Bather, from this evidence, and the reasonable inferences to be drawn therefrom, a jury could find the defendant guilty of criminally negligent homicide.[11] Indeed, by no means can it be said that the evidence fell short of the quantum and standard of proof demanded by section 251 of the Code of Criminal Procedure. To hold otherwise, and excuse the flagrant disregard manifested here, would sanction conduct at which the statute was clearly aimed, and, in effect, abolish the crime of criminally negligent homicide in all homicides resulting from a misuse of a motor vehicle.
Accordingly, the order appealed from should be reversed, and the indictment reinstated.
*337 Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Gibson concur.
Order reversed, etc.

. Additional testimony was elicited from a friend of the defendant, who was in the car at the time of the accident. He testified that at about five o’clock that morning, the defendant entered Magnificent Men’s Social Club. While the witness admitted that he himself had been drinking at the club, he stated that he did not see the defendant “touch anything”. The witness, however, was unable to relate anything about the accident since he was asleep in the defendant’s car at the time.

. See, also, for extensive discussion, 1937 Report of N. Y. Law Rev. Comm. (Communication to the Legislature Relating to Homicide), N. Y. Legis. Doc., 1937, No. 65, at pp. 517-869; Moreland, A Rationale of Criminal Negligence, 32 Ky. L. J. 1.

. Other jurisdictions have adopted this statutory scheme. (See, e.g., Ill. Ann. Stat., ch. 38, §§ 4r-6, 4-7; Wis. Stat. Ann., §§ 940.06, 940.08; see, also, Prop. Mich. Rev. Grim. Code, §§ 305 [c], 305 [d] [Final Draft, 1967]; Study Draft, Federal Criminal Code [June, 1970], § 302.)

. "When homicide committed recklessly becomes murder, see Penal Law, § 125.25 (subd. 2); People v. Poplis (30 N Y 2d 85).

. “ §15.05 Culpability; definitions of culpable mental states. * * * 3. ‘Recklessly.’ A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.”

. Criminally negligent homicide is a Class E, felony, whereas manslaughter in the second degree is a Class C felony.

. Criminal liability for death caused by ordinary negligence is sometimes imposed by statute. It should be noted that most of these statutes are confined to deaths arising out of automobile accidents. (See Riesenfeld, Negligent Homicide, A Study in Statutory Interpretation, 25 Cal. L. Rev. 1; Ann. Automobiles — Negligent Homicide, 20 ALR 3d 473 ; 3 Wharton, Criminal Law and Procedure [R. Anderson ed.], § 976.) For an example of ordinary negligence sufficient to establish liability for a nonvehicular homicide, see People v. .Sandgren (302 N. Y. 331), interpreting a paragraph of section 1052 of the former Penal Law.

. The crime of criminally negligent homicide is one of general application, encompassing an infinite variety of conduct, which consists both of acts of commission and omission. As the Practice Commentary indicates, its principal utility, however, will “ doubtless be the same as that of the former Penal Law’s vehicular homioide crime (§ 1053-a), the application of which was limited exclusively to vehicle cases.” It is to be observed, though, that while under both section 1053-a and section 125.10 ordinary civil negligence is not sufficient to predicate criminal responsibility, the degree of proof required to convict under these sections is different. (Commission Staff Notes, Gilbert Criminal Code and Penal Law [1971], supra, at p. 2-264.)

. Compare Hall, Negligent Behavior Should Be Excluded from Penal Liability, 63 Col. L. Rev. 632; 16 Buff. L. Rev. 749.

. In this regard, it must be observed that it is the Grand Jury which is the arbiter of the credibility and the weight to be given to the evidence. As we wrote in People v. Eckert (2 N Y 2d 126,129) : “ That a trial jury might not convict on this evidence is not our concern. The Legislature has specifically relegated the question of whether a trial jury would return a conviction on this evidence to the judgment of the Grand Jury”. (See, also, People v. Howell, 3 A D 2d 153, 161 n. [Breitel, J.], affd. 3 NY 2d 672; People v. Vaccarella, 257 App. Div. 461; People v. Bob, 233 App. Div. 94.)

. We do not determine whether any one aspect of the defendant’s conduct would in and of itself suffice to establish criminally negligent homicide.