*686 Appeal by the People from so much of an order of the Supreme Court, Kings County (Murphy, J.), dated April 2, 2007, as granted those branches of the defendant’s motion which were to dismiss counts one and two of Kings County indictment No. 6461/06, charging him with criminally negligent homicide and reckless driving.
Ordered that the order is reversed insofar as appealed from, on the law, those branches of the defendant’s motion which were to dismiss counts one and two of Kings County indictment No. 6461/06 are denied, and those counts of the indictment are reinstated.
The evidence before the grand jury, if accepted as true, established that in the early morning hours of March 29, 2006 the defendant drove his vehicle in the wrong direction onto an exit ramp leading from the westbound Belt Parkway (hereinafter the Parkway) in Brooklyn despite signs warning “Do Not Enter” and “One Way.” Upon reaching the Parkway, the defendant had access to substantial paved and grassy shoulder areas. However, instead of utilizing these shoulders to correct his direction, the defendant, upon realizing that he had driven onto the exit ramp instead of the intended entrance ramp, made a slow right turn across the Parkway in order to “loop around” and face the correct direction of traffic.
Two eyewitnesses approaching the defendant’s vehicle while traveling westbound on the Parkway testified that when they initially saw the defendant’s vehicle, it was in the right lane of the Parkway and facing perpendicularly to the direction of traffic. The defendant’s vehicle then moved slowly and in a southwesterly direction across the three lanes of the Parkway, colliding with a motorcyclist who had begun to steer to his left in an attempt to avoid the vehicle. The collision, which caused the motorcyclist’s death, took place in the far left lane, next to the median divider. The Supreme Court determined, inter alia, that the defendant, who had not been drinking or speeding, had accidentally driven onto the exit ramp and did not possess the *687 requisite mental states to establish the charges of criminally negligent homicide and reckless driving. We reverse.
Under Penal Law § 15.05 (4), “[a] person acts with criminal negligence with respect to a result. . . when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.” While a traffic violation does not, in and of itself, constitute an act of criminal negligence (see People v Senisi, 196 AD2d 376, 379 [1994]), such a violation may nevertheless provide a basis from which it can be concluded, in light of additional relevant factors, that the culpable mental state existed (see People v LaFantana, 277 AD2d 395 [2000]; People v Mitchell, 213 AD2d 562, 562-563 [1995]). Here, if accepted as true, the evidence before the grand jury of the defendant’s conduct in turning his vehicle perpendicularly and across three lanes of traffic on a busy highway at a very slow speed, instead of righting the direction of his vehicle by using the available paved or grassy shoulder areas, clearly constituted “a gross deviation from the standard of care that a reasonable person would observe in the situation” (Penal Law § 15.05 [4]; see People v Fuentes, 27 AD3d 481 [2006]; People v McDermott, 15 AD3d 595, 596 [2005]; People v Mitchell, 213 AD2d 562 [1995]), and demonstrated an insensitivity “ ‘to the interest and claims of other persons in society’ ” (People v Haney, 30 NY2d 328, 334 [1972], quoting Model Penal Code, Tent Draft No. 9, at 53).
Our dissenting colleague is of the opinion that the evidence does not “establish that the defendant consciously engaged in conduct which resulted in the creation of an unjustifiable risk of death.” However, the defendant’s conduct herein cannot be characterized merely as a bad choice or simply misguided. While the defendant may have been confused and/or frightened when he realized he entered the highway via an exit ramp and was facing the wrong way, this cannot excuse his conscious decision to execute a U-turn on a high-speed roadway, a maneuver which by its very nature was fraught with dire consequences, instead of exercising the available and far less dangerous option. In fact, when asked for the cause of the accident on a written statement taken by an investigating police officer on the day of the accident, the defendant responded, “my own stupidity.”
We also disagree with the dissent’s conclusion that a videotape of the area in question shows that “there would have been no way for the defendant to reach the ‘arguably’ paved and grassy *688 area without backing up back into the exit ramp,” and that such a “strategy” may not have been reasonable. Instead, our review of the videotape reveals that the “grassy paved” area could have been accessed without much difficulty by driving over what appears to be a relatively low curb area, and that there was ample room, away from the forested area, for the defendant to have turned his car around and driven off the exit ramp in the proper direction. Indeed, it appears that once the defendant reached the top of the exit ramp, he could have driven into the grassy area, executed a three point turn, and driven off the exit ramp with relative ease, or he could have simply backed the car down the exit ramp to the street level. Certainly, either maneuver could have been accomplished with a much greater degree of safety than attempting a U-turn on the highway itself.
Moreover, the case at bar is unlike the situation in the case of People v Cabrera (10 NY3d 370, 378 [2008]), which is relied upon by the dissent, wherein a young inexperienced driver entered “a tricky downhill curve ... at a rate of speed well in excess of a posted warning sign.” The defendant herein was neither a young nor an inexperienced driver, and he did not simply “misgauge his ability to handle road conditions” (id.). Instead, the defendant made a decision to extricate himself from his “wrong way” situation without regard to the substantial and unjustifiable risk created by such decision. Indeed, given that his sight line was “limited” upon entering the exit ramp, and it was dark outside, the defendant should have been that much more careful in maneuvering his vehicle after realizing his mistake. Thus, in contrast to the situation presented in People v Cabrera (id.), the accident herein resulted not from a mere “failure to perceive a risk,” but rather from “criminal risk creation.”
Accordingly, under all of the circumstances, we find that the defendant’s conduct did rise to the level of “morally blameworthiness” so as to justify a charge of criminally negligent homicide (see Penal Law § 15.05 [4]; People v Cabrera, 10 NY3d 370 [2008]; People v Boutin, 75 NY2d 692 [1990]). Therefore, viewing the evidence in the light most favorable to the prosecution, the evidence was legally sufficient to support the defendant’s indictment for the crime of criminally negligent homicide (see People v Fuentes, 27 AD3d 481 [2006]; People v McDermott, 15 AD3d at 596; People v Basak, 275 AD2d 419 [2000]; People v Linares, 215 AD2d 201 [1995]).
Similarly, the evidence before the grand jury was legally sufficient to support the defendant’s indictment for reckless driving. Reckless driving is defined as “driving or using any motor *689 vehicle ... in a manner which unreasonably interferes with the free and proper use of the public highway, or unreasonably endangers users of the public highway” (Vehicle and Traffic Law § 1212). The evidence presented by the People, that the defendant turned his vehicle perpendicularly and across three lanes of traffic on a busy parkway, was sufficient to demonstrate that he “unreasonably endanger [ed] users of the public highway.” Consequently, the evidence was also legally sufficient to support the defendant’s indictment for reckless driving (see People v Fuentes, 27 AD3d 481 [2006]).
Thus, we reinstate the counts of the indictment charging the defendant with criminally negligent homicide and reckless driving. Santucci, J.R, Covello and Chambers, JJ., concur.
Belen, J. (dissenting and voting to affirm the order insofar as appealed from, with the following memorandum): I respectfully dissent. The evidence before the grand jury, if accepted as true, established that in the early morning hours of March 29, 2006 the defendant accidentally drove in the wrong direction, entering onto an exit ramp for traffic exiting the westbound Belt Parkway (hereinafter the Parkway) in Brooklyn. A detective from the Highway Patrol Section of the New York City Police Department who investigated the scene testified before the grand jury that the signage could potentially be misunderstood. The detective testified that, upon reaching the Parkway, the defendant had access to a substantial paved and grassy shoulder area. However, instead of utilizing the shoulder, the defendant, upon realizing that he had driven onto the exit ramp instead of the intended entrance ramp, made a right turn across the Parkway in order to face the correct direction of traffic.
A videotape prepared by mounting a camera to a police vehicle was shown to the grand jury, allegedly demonstrating the route taken by the defendant on that fateful night. The videotape, however, was taken in broad daylight, under sunny conditions at a time when there was considerable traffic in all directions on the Parkway, including cars coming off the exit ramp while the police vehicle attempted to enter the wrong way. The police vehicle in the videotape did not continue onto the Parkway, but stopped at the mouth of the ramp. Unlike the oral testimony presented to the grand jury, the videotape shows that, having reached the beginning of the exit, there would have been no way for the defendant to reach the arguably “substantial” paved and grassy area without backing up back onto the exit ramp, a strategy that may not have appeared to have been preferable or even reasonable at the time. The area in question would have been behind the driver exiting the ramp, and there *690 were trees and a high curb that would have to be negotiated to back up in that space. Thus, the detective’s characterization of the defendant’s options was not supported by the evidence before the grand jury.
There is no evidence that the defendant had sufficient unobstructed space in which he could have turned around without utilizing the Parkway itself, even if the evidence is viewed in the light most favorable to the People. If the defendant had chosen to back up or otherwise attempt to access this shoulder, there is no telling whether the same or a similar accident may have occurred. Finally, the videotape evidence before the grand jury did not itself accurately reflect the conditions that the defendant faced at 2:30 a.m., in the dark, with the shoulder behind him.
Two eyewitnesses, the driver and a front seat passenger, in a car approaching the defendant’s vehicle while traveling westbound on the Parkway, testified that the decedent, riding a motorcycle, came quickly from behind them in the center lane. The decedent “zoomed by” them and passed them on the right, “going very fast,” traveling at a speed at least 10 to 15 miles per hour faster than their speed of approximately 50 to 55 miles per hour. The decedent motorcyclist then moved in front of them in the center lane. The eyewitnesses next saw the defendant’s vehicle in the right lane of the Parkway facing perpendicularly to the direction of traffic. The defendant’s vehicle was moving “very slowly” at a “slow, slow speed” and in a southwesterly direction across the three lanes of the Parkway before the collision with the decedent.
In an attempt to avoid the defendant’s vehicle, the decedent steered his motorcycle to the left, and struck the defendant’s vehicle on the driver’s side. The collision, which caused the decedent’s death, took place in the far left lane, next to the median divider.
The Supreme Court determined, inter alia, that the defendant, who had not been drinking or speeding, had accidentally driven onto the exit ramp due to the poor signage in the area and did not possess the requisite mens rea to establish the charges of criminally negligent homicide and reckless driving.
A traffic violation does not, in and of itself, constitute an act of criminal negligence. However, such a violation may nevertheless provide a basis from which it can be concluded, in light of additional relevant factors, that the culpable mental state existed (see People v Senisi, 196 AD2d 376, 379 [1994]).
A divided Court of Appeals in People v Cabrera (10 NY3d 370 [2008]) recently held that a teenaged driver did not commit *691 criminally negligent homicide although his speeding led to the death of three passengers in his car. In Cabrera, the defendant was driving three teenage friends, none of whom, other than Cabrera, were wearing seatbelts. The majority stated: “There was testimony and forensic evidence that Cabrera, a young and inexperienced but sober driver, entered a tricky downhill curve, the site of other accidents, at a rate of speed well in excess of the posted warning sign. This behavior is certainly negligent and unquestionably ‘blameworthy.’ But our decisions have uniformly looked for some kind of morally blameworthy component to excessive speed in determining criminal negligence; for example, consciously accelerating in the presence of an obvious risk (see [People v] Paul VS., 75 NY2d 944 [1990]). No such morally blameworthy behavior could be inferred from the testimony in this case. For a 17 year old to badly misgauge his ability to handle road conditions is not the kind of seriously condemnatory behavior that the Legislature envisioned when it defined ‘criminal negligence,’ even though the consequences here were fatal. This crash resulted from a noncriminal failure to perceive risk; it was not the result of criminal risk creation.”
Even upon viewing the evidence in the light most favorable to the People, the fact that the defendant here was traveling on the wrong side of the road does not alone establish that he consciously engaged in conduct which resulted in the creation of an unjustifiable risk of death (see People v Lasch, 152 AD2d 983 [1989]), particularly in light of the undisputed fact that the signs leading to the Parkway’s entrance ramp were confusing and difficult to see.
The requisite mental state for criminal negligence is as follows: “A person acts with criminal negligence with respect to a result or to a circumstance described by statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation” (Penal Law § 15.05 [4]).
It is clear that criminal negligence requires more than merely making a bad choice, as stated in People v Boutin (75 NY2d 692, 695-696 [1990]): “[C]riminal liability cannot be predicated on every act of carelessness resulting in death, that the carelessness required for criminal negligence is appreciably more serious than that for civil negligence, and that the carelessness must be such that its seriousness would be apparent to anyone who shares the community’s general sense of right and wrong *692 . . . criminally negligent homicide requires not only a failure to perceive a risk of death, but also some serious blameworthiness in the conduct that caused it. The risk involved must have been substantial and unjustifiable, and the failure to perceive that risk must have been a gross deviation from reasonable care” (citations and internal quotation marks omitted).
The U-turn made by the defendant was undoubtably wrong; however, the defendant’s failure to perceive the risk cannot be viewed as morally blameworthy under the circumstances here presented (see People v Cabrera, 10 NY3d 370 [2008]).
In People v Paris (138 AD2d 534 [1988]), a divided Appellate Division, Second Department, held that the defendant driver, who suddenly accelerated and veered to the left, crossing a double yellow line, going on to the sidewalk, and crashing into the phone booth, was not guilty of criminally negligent homicide of the passenger who died as a result of injuries sustained in the collision. A witness to the event testified that the driver was not sitting upright at the wheel but was slumped to one side. The court stated that if there had been evidence that the defendant was driving from a recumbent position intentionally in order to avoid detection, his actions would surely have constituted criminally negligent homicide. “However, the far more reasonable inference to be drawn from the evidence is that the defendant was not consciously attempting to drive from such a position, but rather that he either sank to that position after having fallen asleep or unconscious, or that he assumed that position as the result of some perceived emergency” (id. at 537).
Here, it can reasonably be inferred that the defendant’s misguided U-turn was a response to the emergency situation in which he found himself when he entered on the wrong side of a major roadway. Even if the defendant, when faced with this emergency situation, possibly did not make an intelligent or prudent choice in his attempt to remedy the situation, this error does not rise to the level of “morally blameworthy” conduct required to establish that the defendant committed the crime of criminally negligent homicide, despite the tragic consequences of his actions. Moreover, it is not at all clear that, having mistakenly entered the Parkway via the exit ramp due to the concededly confusing signage, that there was another intelligent or prudent choice to be made.
Similarly, the misdemeanor count of Vehicle and Traffic Law § 1212, alleging reckless driving, cannot be substantiated under the facts here. “Reckless driving” means the running or operation of an automobile under such circumstances as to show a reckless disregard of the consequences and calls for evidence *693 showing something more than mere negligence (see People v Grogan, 260 NY 138, 143-144 [1932]).
Even if there were a preferable alternative to the defendant’s attempt to correct his mistake of entering the Parkway by means of an exit ramp other than by then making a wide, slow U-turn on the highway, it cannot be said that the defendant was criminally negligent or reckless because another alternative did not occur to him when he was confronted with the frightening reality of his precarious position. His conduct did not clearly constitute “a gross deviation from the standard of care that a reasonable person would observe in the situation” (Penal Law § 15.05 [3]), and did not demonstrate “ ‘conduct which is inadvertent as to risk only because the actor is insensitive to the interest and claims of other persons in society’ ” (People v Haney, 30 NY2d 328, 334 [1972], quoting Model Penal Code, Tent Draft No. 9, at 53 [pedestrian, crossing a city street at the crosswalk with green light in her favor, struck and killed by speeding motorist going at least 52 miles per hour through the red light]).
The defendant did not engage in criminal risk creation, but rather, simply tried to avoid an accident (see People v Cabrera, 10 NY3d 370 [2008]). Accordingly, the evidence, viewed in the light most favorable to the People, if unexplained or uncontradicted, would not warrant the defendant’s conviction by a petit jury (see People v Galatro, 84 NY2d 160, 163 [1994]). Therefore, the Supreme Court properly granted that branch of the defendant’s motion which was to dismiss counts one and two of the subject indictment charging him with criminally negligent homicide and reckless driving.